[No. 30227. Department Two. September 18, 1947.]

*In the Matter of the Guardianship of* MARY MARGARET HARDISON, *a Minor.*

ALICE E. KING *et al., Appellants,* v. JENNIE E. HARDISON-MILLER, *as Guardian, Respondent.*[1]

[1]Reported in 184 P. (2d) 840.

*LaBerge & Lyon* and *Cherry & Hull,* for appellants.

*Gavin & Robinson,* for respondent.

JEFFERS, J.—On October 15, 1937, Jennie E. Hardison-Miller was duly appointed guardian of the person and estate of her daughter, Mary Margaret Hardison, a minor. Mrs. Miller qualified and has been acting as such guardian at all times since.

The property involved in this action belongs to the minor, and is described as follows: Lot 4, block 4, Bungalow Addition to North Yakima, according to the plat thereof recorded in volume E of Plats, at page 11, records of Yakima county, Washington. Located on the property is a building divided into two small apartments.

The proceeding with which we are here concerned was instituted by Alice E. King, whose husband is Glen M. King, by filing in the guardianship matter, on or about May 27, 1946, a petition for an order directed to the above-named guardian, requiring her to appear and show cause why she should not make, execute, and deliver to petitioner a good and sufficient guardian's deed to the above-described property, together with a policy of title insurance, in accordance

with an order confirming a private sale of the property, made and entered in the guardianship matter on December 18, 1945, and a contract entered into between the guardian and the Kings, as directed in such order.

The guardian filed an answer to this petition and a cross-petition, to which we shall later refer.

The petition of Alice E. King and the relief asked for therein are based primarily on certain proceedings had in the guardianship relative to a private sale of the property. It will be necessary to set out in some detail these proceedings, in order that an understanding may be had of the contentions made in this action.

Reference will be made in this opinion to Nettie C. Schlade, who is a bonded real estate agent residing in Yakima. This lady admittedly was the agent of the guardian in conducting the sale to which we shall refer, and was the person who contacted the Kings and who engaged in all the conversations with the Kings relative to the sale.

The property here in question was acquired by the minor by virtue of a warranty deed from Mary L. Zabel, a widow, on August 4, 1938.

On November 10, 1945, the guardian filed a petition in the guardianship matter, asking that she be authorized to sell the property of her ward at private sale, for the purpose of raising money for the care, support, and education of the minor, and also for the purpose of reinvestment of the funds to be derived from the sale. It was alleged in the petition that the petitioner had a prospective purchaser, who was ready, able, and willing to purchase the property upon a small down payment, the balance to be evidenced by a real estate contract to be submitted to and approved by the court.

On the day the petition was filed, the court commissioner entered an order authorizing the guardian to sell the property at private sale. The order shortened the time of the notice to be published to a day not less than eight days from the date of the first publication of the notice. The order further provided that the sale be made either for cash or under a real estate contract, the terms and conditions of

which should be satisfactory to and approved by the court. The date of the sale was fixed for a day on or after November 27, 1945. Notice of the sale was published as provided in the above order and posted as provided by law.

It being necessary, according to the order and the law governing the sale of such property at private sale, to have an appraisement of the property within one year next before the sale, the court, on November 13, 1945, appointed Dr. Peter G. Mackintosh, C. A. Marsh, and Nettie C. Schlade to appraise the property of the minor. On November 26, 1945, the appraisers, having qualified, appraised the property at four thousand dollars, which amount they certified was the fair market value of the property. On November 28, 1945, Alice King submitted a written bid for the property for the sum of four thousand dollars. The bid provides:

"The undersigned, Glen M. King and Alice E. King, husband and wife, being desirous of purchasing the real property hereinafter described, do hereby bid and offer the reasonable value thereof, in the sum of Four Thousand no/100 ($4000.00) Dollars as the purchase price, of which the down payment is $500.00, as follows, to wit: All of the estate real property located in the county of Yakima, state of Washington, described as follows, to wit: . . . [Then follows a description of the property as set out above.]"

The bid further provides:

"Terms of Sale: We desire to purchase said property under a real estate contract, in accordance with the terms and conditions of the original order authorizing private sale of estate property (a copy of which has been submitted for our inspection).

"Subject to: The acceptance of this bid and the confirmation of such sale by the court. It being understood that all deferred principal, (including interest at 5½ per cent. per annum), shall be payable in monthly installments, Fifty and no/100 ($50.00) Dollars."

The bid further provides:

"However if the undersigned bidder, or bidders, are successful and the court confirms the sale to them the court is requested to order and direct said guardian to furnish to bidder a Washington Title Owner-Purchaser, or General Policy, of Title Insurance, covering said property, in the

amount of the contract sale price showing marketable title thereto, with all taxes and assessments paid to and including the date of the order of confirmation and allow bidder, (or their attorney), an inspection of said policy, as and when the same is issued."

It may be stated here that Mrs. Schlade procured the above bid from Mr. Ferris, the attorney for the guardian, and took it to the Kings for their signatures. Mrs. Schlade stated that, at the time she took the bid to the Kings, she gave them the papers to read and told them that was the procedure which had to be gone through by a guardian, and that there was no further discussion.

On December 6, 1945, the guardian filed what is termed "Acceptance of Bid and Return of Sale." This return refers to all the proceedings had up to that time, and then recites:

"That pursuant to an order authorizing private sale of estate property. Said notice was issued, filed, posted and published in the Yakima Daily Republic for not less than one (1) week, to wit: On November 14, 1945, as directed in said order.

"That the date of sale was fixed for on or after November 27, 1945.

"A bid in writing, dated November 27, 1945 and filed in said cause on November 28, 1945, in the sum of $4,000.00, of which the down payment is $500.00, was made by Alice E. King (whose husband is Glen M. King); interest at $5\frac{1}{2}\%$, monthly installments of $50.00.

"Terms of Sale: That said bidder desires to purchase said property under a real estate contract and (as provided in said order); and

"Said bid or offer, is hereby accepted; and

"I have sold to said-named bidder, Alice E. King, (whose husband is Glen M. King) for said consideration and hereby make the within acceptance of bid and return of sale as to the real property located in the county of Yakima, State of Washington, described as follows, to wit: [Description of the real property.] . . .

"The appraised value of said property is $4,000.00.

"That said bid or offer, is more than ninety (90) per cent. of said appraised value.

"Therefore your petitioning guardian requests and petitions the court, that, upon the filing of the within and foregoing acceptance of bid and return of sale:

"That any time after the expiration of ten (10) days from the filing hereof that the court, without notice, approve and confirm such sale by the entry in this cause of its order approving and confirming private sale of said estate *real property*, to the said bidder, Alice E. King; and

"Among other things therein authorized, ordered and directed that your petitioning guardian make, execute and deliver to said bidder the necessary and proper instrument, to wit: Real estate contract in accordance with said order of sale, bid, etc." (Italics ours.)

On December 18, 1945, the court made and entered an order approving and confirming the sale to Alice E. King. The order states that the guardian was personally present at the hearing and was represented by her attorney, E. A. Ferris. The order also sets out all of the proceedings leading up to the order of confirmation. It recites that all the provisions of the laws of the state of Washington governing private sales of guardianship estate property have been fully complied with, *and that the sale was fairly conducted.* The order then provides:

"It is further ordered, adjudged and decreed: That said bid should be and the same is hereby accepted and the real property hereafter described should be and the same is hereby sold to said named bidder, Alice E. King (whose husband is Glen M. King), for the amount of her said bid or offer of $4,000.00, with a down payment of $500.00 and that all deferred principal (including interest at five and one-half (5½) per cent.) shall be payable in monthly installments of not less than fifty ($50.00) dollars; and

"It is further ordered: That at any time after the signing and filing of this order, said guardian should be and she is hereby authorized, *ordered and directed to accept said down payment* of $500.00 and thereupon *make, execute and deliver to said bidder the necessary and proper real estate contract,* and in which she shall agree to sell, and the said bidder, as purchaser, agrees to purchase all of the estate real property located in the county of Yakima, state of Washington, described as follows, to wit: [Description of the real property herein first described.] . . .

"*That said sale is hereby approved and confirmed.*

"It is further ordered: That the said guardian's real estate contract shall not be or become effective for any purpose whatsoever *until it has been submitted to and approved*

*by the court* (a copy of which proposed real estate contract is hereto attached)." (Italics ours.)

The above-mentioned real estate contract, signed by Alice E. and Glen M. King, and Jennie E. Hardison-Miller, as guardian, on December 18, 1945, was introduced as exhibit No. 8. This contract bears the approval of the court commissioner on December 18, 1945.

By the order, the guardian was authorized to pay Nettie C. Schlade two hundred dollars for her services in assisting in completing the sale, and on December 20, 1945, the court entered an order allowing Mr. Ferris, attorney for the guardian, one hundred forty dollars for services rendered in connection with the sale to the Kings.

On or about March 8, 1946, the guardian caused to be served on Alice King a notice of forfeiture of the real estate contract. The notice states that the guardian is entitled to the legal and actual possession of the premises above described

" . . . by reason of the fact that under and in virtue of a certain real estate contract, dated December 18, A. D., 1945, between the parties hereto, you, the said Purchaser therein agreed to purchase said property in the original sum of Four Thousand and no/100 Dollars . . . . . . . $4,000.00 with a down payment of Five Hundred and no/100 Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   500.00

unpaid balance of Three Thousand Five Hundred and no/100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $3,500.00 which was to bear interest at the rate of five and a half (5½%) per cent. per annum; and

"Said contract further provides that payments of principal and interest shall be paid in monthly installments, (including interest) in sums of not less than Fifty and no/100 Dollars ($50.00), the first installment of which shall be paid on or before the 18th day of January, A. D. 1946, and a like sum on or before the 18th day of each succeeding month thereafter or as much more as purchaser desires to pay etc. and as more fully set forth therein, reference to which contract is hereby made."

It is further stated that all of such payments were to be made at the Yakima branch of the National Bank of Com-

merce, and that the contract further provided that purchaser was to procure and deliver to seller a fire insurance policy. The notice further provides:

" . . . and you are further notified that you have *failed, neglected and refused to make any of the said monthly installment payments* of Fifty and No/100 Dollars ($50.00), or any other sum, and have *failed and neglected to furnish to seller the fire insurance policy*; therefore, purchaser's right under said contract should be, and the same is hereby forfeited . . .

"Therefore demand is hereby made that you vacate said property and deliver actual possession, and the key or keys thereof, to seller on or before March 11, A. D., 1946."

On March 20, 1946, Alice E. King filed in the guardianship a petition asking that the guardian be required to appear and show cause why she refused to comply with the contract as she was directed to do by the order of confirmation. This petition sets out all the proceedings taken by the guardian, including the order of confirmation. It is further alleged in the petition that, upon the execution of the contract, petitioner paid to Nettie C. Schlade the down payment of five hundred dollars, and was promised a title insurance policy; that no such policy has ever been delivered to petitioner; that on or about March 8, 1946, the guardian caused to be served upon petitioner a notice of forfeiture, in which she demanded the immediate possession of the premises, without giving any opportunity to remedy the claimed default. It is further alleged that a few days after the service of such notice, petitioner caused to be tendered to the National Bank of Commerce an amount sufficient to cover all payments due in January, February, and March, together with interest to the date of the tender; that such payments were refused by the bank, and a tender was then made to Mr. Ferris, which was refused; that a tender was then made to the guardian, personally, which was also refused; that the tender, together with an insurance policy, was then deposited in the registry of the court.

The contract provides, relative to the service of all demands, as follows:

"Notice or other papers, in respect to any such default, may be made by registered mail, to the address of purchaser, or his assigns, last known to seller, or personally served as required by law; and (each and every default) shall be made good by purchaser, within thirty (30) days, after any such notice in writing required by law, or as herein provided, has been registered or personally served upon, and purchaser agrees to pay to seller the reasonable fee for preparing, and the postage paid for sending (or the fees for serving) any such notice, before being reinstated hereunder."

It is apparent from the record that a tender of all payments for which a forfeiture was claimed, together with interest and costs, was made and refused within thirty days after receipt of the notice of forfeiture, and it is not contended to the contrary in this proceeding.

After the filing of the above petition, the guardian appeared and filed motions to strike the petition, quash the order to show cause, and for a continuance of the hearing upon the order to show cause. She also filed a demurrer.

The matter came on for hearing upon the order to show cause, and, the court having stated that it would first hear arguments on the motion for a continuance, such arguments were made. Before the court had ruled, counsel for the guardian announced that she would have no objection to the entry of an order at that time requiring her to accept the payments tendered, as alleged in the petition, and the insurance policy, so long as her acceptance thereof be wholly without prejudice to her right to assert in these proceedings or in any other proceedings or actions that the sale of real property set forth in the petition was wholly invalid, and should be set aside or reformed. Thereupon counsel for petitioner indicated that an order could be entered, so long as such order be without prejudice to the right of either party to the proceedings; whereupon the court, on April 1, 1946, entered an order directing the guardian to accept the tendered payments and the insurance policy, such acceptance being wholly without prejudice to the right of the guardian to attack the validity of the sale in these or any other proceedings, and wholly without prejudice to her

right to bring any and all actions attacking the validity of such sale or asking for the reformation of the contract of sale, it being considered that this order was in no way to be considered as an adjudication by and between the parties as to the validity or invalidity of such sale.

It was further ordered that, until the further order of the court, or any other court having jurisdiction, payments under the contract might be made by petitioner to the National Bank of Commerce, as provided in the contract, and that such payments should be accepted by the guardian without prejudice to her rights.

It is difficult to understand the position taken by the guardian in the proceeding last above referred to, in view of her knowledge of the situation and her subsequent actions.

On May 27, 1946, Alice E. King filed another petition, being the petition first referred to in this opinion, asking that the guardian be required to appear and show cause why she should not make, execute, and deliver to petitioner a good and sufficient guardian's deed to the real estate, together with a policy of title insurance. This petition contains practically the same allegations as the former petition, with the following additional allegation: The petition sets out the order of court entered April 1, 1946, hereinbefore referred to. It is further alleged that on April 17, 1946, petitioner deposited with the National Bank of Commerce a payment of fifty dollars to apply upon the contract, and on May 15, 1946, she deposited the sum of $3,378.02, being the unpaid balance of the contract, with accumulated interest; that the bank accepted such payments, and demanded a deed to be issued by the guardian to Alice E. King, according to the terms of the contract; but that the guardian has failed, neglected, and refused to make, execute, and deliver such deed, and contends, for some reason, that petitioner has no right to such deed.

It may be stated here that the guardian makes no contention that the amount last above mentioned is not sufficient to pay the balance due, if the contract is a valid and binding contract on the guardian.

On October 17, 1946, the guardian filed an answer to the above petition and a cross-petition. By her answer, the guardian denied all the allegations of the petition, except as such allegations are supported by the files and records and admitted in the cross-petition. By her cross-petition, the guardian alleged in substance that she purchased the property here involved with her own separate funds, and had the title taken in the name of her daughter, as grantee, it being her intention to make a gift of the property to her daughter; that, after the acquisition of the property, which consisted of a small duplex, cross-petitioner operated and managed it, and made substantial and numerous additions and improvements to the building; that cross-petitioner moved into one of the apartments and placed certain personal property and household furnishings therein.

It was further alleged that, in October, 1945, cross-petitioner believed that, because of the recent rise in the price of real estate, it would be advantageous to the minor and to her estate to sell the property, and that it also appeared desirable to sell the personal property included in the premises, as the larger part thereof was specifically adapted and suitable for use in the duplex.

It was further alleged that cross-petitioner, acting by and through Nettie C. Schlade, a bonded real estate agent who had been employed by her to assist in completing the sale, entered into an oral agreement with the Kings for the sale of the real property, *together with all of the personal property included therein,* for the sum and purchase price of $6,850, of which the amount of $2,350 was to be paid by the purchasers as the down payment thereof, leaving a balance of $4,500, which was to be paid in installments at the rate of fifty dollars per month; that in partial performance of the contract, the purchasers paid down the sum of five hundred dollars, as earnest money, to Nettie Schlade, and entered into possession of the premises.

It was further alleged that all of the parties to the oral agreement knew and understood that title to the real estate was in Mary Margaret Hardison, a minor, and *all understood and believed at that time that the personal property*

*on the premises belonged to cross-petitioner individually;*
that it was further agreed that the contract·in question
would not be reduced to writing at the time the partial
performance occurred, because each believed that the ap-
proval of the court would be a necessary prerequisite to
the completion of that portion of the transaction involving
the title to the real property.

It was further alleged that cross-petitioner then pro-
ceeded to obtain permission of the court to sell the real es-
tate of the minor, at which time cross-petitioner knew that
the cost and value of the physical improvements, accre-
tions, and additions made by her to the real property, to-
gether with the fair reasonable market value of the personal
property and household furnishings on such property,
*which it was believed belonged to cross-petitioner, indi-*
*vidually, exceeded the sum of $2,850; that cross-petitioner,*
*believing in good faith, that she had an interest in the real*
*property to the extent of the improvements, accretions,*
*and additions made thereon, and in good faith believing*
*that it was proper that she be entitled to be compensated*
*for the cost and value of such improvements and the fair*
*reasonable market value of her personal property* out of the
purchase price of $6,850, and further believing that the
sum of $2,850 had been or would be paid by the Kings prior
to the date the court authorized the sale of such real es-
tate, and believing that the balance of four thousand dol-
lars would be paid under an executory contract of sale at
the rate of fifty dollars per month, arranged with her then
counsel, E. A. Ferris, to obtain the authorization of the
court for a sale of the real property for four thousand dol-
lars; that thereafter the necessary petition, order, etc.,
were prepared by such attorney and presented to the court,
with a view of obtaining the approval of the court for the
sale of the real property for such sum.

It was further alleged that at all times it was the under-
standing and agreement of cross-petitioner and the pur-
chaser that the real and true contract for the purchase of
the property was for the sum of $6,850, including real and
personal property as a unit, of which the sum of $2,350 was

to be paid in cash as a down payment, and it was further understood and agreed by all the parties that the proceedings in the guardianship estate to obtain the court's approval of a sale reflecting the amount of four thousand dollars as the purchase price for the real property, were consummated and completed to permit and enable cross-petitioner to be honestly and fairly reimbursed for her costs and expenses incurred by her in making physical improvements upon the real estate, and for the value of her individually owned personal property situated on the real estate.

It was further alleged that cross-petitioner now realizes that she was in error in making an arrangement for her reimbursement for the improvements made by her in the real property, by which the moneys for which she was reimbursed would not add to the funds of the guardianship estate.

It was then alleged that, by reason of the refusal of the Kings to carry out the oral agreement, a situation existed whereby real property owned by the minor, which was of the fair market value of six thousand dollars, was included in the contract for its sale for four thousand dollars, same being a grossly inadequate price; that the sale and all orders of approval and confirmation should be set aside *in toto*; that in the event the court should determine that such sale should not be set aside, it should enter a decree reforming the existing contract, so that it reflects the true agreement of the parties, as hereinabove set out.

The Kings, by their reply, denied the allegations of the cross-petitioner, and as a further reply alleged that the guardian

"... is estopped by her actions and by the record in this cause, which record was prepared by her and her attorney, from raising any question concerning the validity of the sale of said real estate, and for the further reason that said Jennie E. Hardison-Miller in her individual capacity has no right to recover in these guardianship proceedings any money for the sale of her individual personal property."

The cause came on for hearing before the court on the pleadings above set out and the records of the guardianship, which were referred to and made a part of such pleadings.

Over the objections of the Kings, the guardian was permitted to offer proof to sustain her cross-petition.

Mrs. Schlade stated that she first contacted the Kings in the latter part of October, 1945, and took them to look at the property; that she stated to them the price would be $6,850 for the house and certain furnishings; that the Kings were anxious to find a place to live and agreed to the above price; that Mrs. King paid Mrs. Schlade five hundred dollars down, and the next day the Kings were permitted to move into one side of the duplex.

Sometime between the fifth and tenth of November, Mrs. Schlade, being anxious to have escrow papers prepared and to obtain the signatures of the Kings to an earnest money receipt, took the Kings to an abstract office, where they were informed that Mrs. Miller could not sign escrow papers, as the property stood in the name of the minor, and that, before a sale could be made, certain court proceedings would be necessary. At that time, Mrs. Schlade produced an earnest money receipt, which, at the hearing, was introduced as exhibit No. 7. It purports to show a receipt by Mrs. Schlade from the Kings of the sum of $2,350, as partial purchase price of lot 4, block 4, Bungalow Addition to Yakima, together with furnishings, which had been sold to the purchaser for $6,850. Mr. King first examined this receipt, and refused to sign it. Mrs. King also refused to sign it.

While Mrs. Schlade stated that, when she first talked to the Kings, she knew the property belonged to the minor, we seriously doubt that statement, and certainly it is apparent from her own testimony that she did not know, nor did the Kings know, that any court procedure would be necessary until the visit to the abstract office sometime between November 5th and 10th, which was after the conversations upon which the alleged oral agreement is based. Mrs. Murphy, to whom Mrs. Schlade talked in the ab-

stract office, stated that she could not prepare the escrow instructions because the parties were not in agreement as to the price.

The proceedings relative to the sale of the property were all conceived and carried through by the guardian and her then attorney, Mr. Ferris. It does not appear that the Kings suggested or took any part in such proceedings, other than to sign the bid, which was prepared by Mr. Ferris and presented to the Kings for their signatures by Mrs. Schlade, and to sign the contract of December 18, 1945. There is absolutely no evidence tending to show that any fraud was perpetrated by the Kings, or either of them, on the guardian or the court, in so far as the court proceedings relative to the sale are concerned. It is apparent from the cross-petition of the guardian and from her testimony that she refused to comply with the order of confirmation and the contract because of the refusal of the Kings to pay, in addition to the $4,000 purchase price, as expressed in the contract, the further sum of $2,850, which was to go to Mrs. Miller individually for improvements claimed to have been made by her, and for personal property belonging to her, located in the apartments.

Mrs. Schlade admitted that, at the time the appraisal of the property was prepared, which was about November 26, 1945, Mrs. Miller told her that she (Mrs. Miller) wanted to get out of the guardianship sale what she had put into the property; that this was after the proceedings had been started; that Mrs. Miller did not state the amount she expected to receive, but said that she wanted to get out of the sale what she had put into the property, and to recover, through the guardianship proceedings, the value of the household goods which she personally owned. Mrs. Miller stated that she expected to be paid $2,850, and that the Kings would accept the contract for $4,000.

Assuming that the Kings agreed to pay $6,850 for the real estate and personal property, as contended by the guardian, we think the evidence introduced by the witnesses called by the guardian quite conclusively shows that all the estate of the ward was to receive from the sale was $4,000,

and that the $2,850 additional was to go to Mrs. Miller for personal property belonging to her individually and to reimburse her for claimed expenditures made on the property.

On December 21, 1946, the trial court entered a decree purporting to reform the contract of December 18, 1945, to the extent of changing the purchase price of $4,000, as recited in the contract, to $6,850. The decree further reformed the written contract by adding to the description of the real estate the following:

"Together with any and all personal property situated and used therein, except those items of personal property designated by the seller and which shall, by agreement of the parties, be removed by the seller from the premises."

The written contract was further reformed, in that the balance of $3,500 was changed to $6,350.

The decree further provided that the contract of December 18, 1945, as reformed, was confirmed, and that the proceedings filed in the action leading up to the execution of such contract were made applicable to the contract as reformed, and as made applicable to the contract as reformed, were confirmed.

The Kings have appealed from the decree, and assign error on the action of the court (1) in reforming the real estate contract, where the sale and contract had previously been confirmed by the court; (2) in reforming the contract for the sale of real estate sold at public sale, at the instance of the guardian, when the guardian had recognized and relied on the contract by giving notice of forfeiture thereunder; (3) in reforming the contract to include personal property owned individually by the guardian, when she was not a party to the action in her individual capacity; (4) in overruling appellants' objections to the admission of parol testimony and in admitting parol testimony which tended to vary the terms of the written contract; (5) in overruling appellants' objection to the admission of parol testimony and in admitting parol testimony tending to show fraud in the appraisal of the property made in the guardianship sale proceedings; and (6) in refusing to grant

the prayer of appellants' petition and in granting respondent a decree of reformation.

We seriously doubt that the evidence in this case supports a finding that the Kings ever agreed to pay $6,850 for the real estate belonging to the minor and the personal property belonging to Mrs. Miller, individually. However, there is evidence which would support a finding that the Kings orally agreed to pay $6,500 for the real estate and personal property.

We think no authority is needed to support the statement that Mrs. Schlade, as the agent of the guardian, admitting that she had the same power to act as the guardian herself, could not enter into a binding agreement relative to a sale of the minor's property, without being authorized by the court so to do.

It was apparently after being informed at the abstract office that court proceedings would be required in order to sell the minor's real estate that the guardian and her attorney conceived and carried through the proceedings which resulted in the order of confirmation and the written contract of December 18, 1945.

Appellants first contend that the order of confirmation entered by the court commissioner on December 18, 1945, and the approval of the written contract by the court on the same date, are conclusive and binding upon the parties thereto and upon the court, and that no question relative to the validity of such sale can be raised by the guardian in this proceeding.

On the other hand, the guardian contends that a court of equity will not permit the Kings to gain the unconscionable advantage and unjust enrichment which would result from their specifically enforcing the contract to purchase the property of the minor for four thousand dollars. The guardian further states in her brief:

"Assuming for the sake of argument that the sanctity of a judicial sale bars an attack upon its validity by the guardian here, does it necessarily follow that the court will lend its aid to enforce an inequitable contract against the guardian because such contract mistakenly came into existence by reason of a misdirected judicial sale"?

We are of the opinion that a decision of the questions which are decisive in this case do not call for the application of the rules governing an ordinary proceeding to specifically enforce an executory real estate contract. It is our opinion that appellants are, in fact, seeking to compel the guardian to comply with the order of confirmation, wherein the court approved and directed the guardian to enter into a certain real estate contract for the sale of the ward's property, which contract the guardian, pursuant to the direction of the court, did enter into, but now refuses to comply with. It seems to us that the only contract which the guardian could or did legally enter into, in so far as the property of her ward is concerned, was the written contract of December 18, 1945, and that unless there was such fraud proved as would warrant the court in vacating the order of confirmation, such order of confirmation and the contract are binding and conclusive upon the parties and the court.

Rem. Rev. Stat., § 1585 [P.P.C. § 206-43], provides:

"No sale by any guardian of real or personal property shall be void or be set aside or be attacked because of any irregularities whatsoever, and none of the steps leading up to such sale or the confirmation thereof shall be jurisdictional, and the confirmation by the court of any such sale shall be conclusive as to the regularity and legality of such sale or sales, and the passing of title after confirmation by the court shall vest an absolute title in the purchaser, and such instruments of transfer may not be attacked for any purpose or any reason, except for fraud."

"An order confirming or refusing to confirm a judicial sale is a *final and conclusive judgment,* with the same force and effect as any other final adjudication of a court of competent jurisdiction, determining, until set aside, the rights of all parties, and concluding as by a judicial decree all matters involved in the scope of the proceeding, including those which the court might have been called upon to decide had the parties chosen to bring them forward as objections to the confirmation. Such an order is subject to attack only by such methods as are available to set aside other decrees; it is generally held that, after confirmation, matters arising between the time of the decree and of the sale do not afford grounds for collateral attack. As is sub-

sequently noted, the decree of confirmation is generally conclusive as to the terms of the sale, and it is also regarded as conclusive as to the identity, quantity, and condition of the property sold, particularly where with knowledge of the facts the parties raised no objection to the confirmation. In some jurisdictions statutory provision is made as to the conclusiveness of a decree of confirmation." (Italics ours.) 31 Am. Jur. 469, § 132.

The same text, at p. 470, § 134, states:

"Since it has the effect of a final conclusive judgment, a final order of confirmation cures all irregularities, misconduct, and unfairness in the making of the sale, departures from the provisions of the decree of sale, and errors in the decree and the proceedings under it which are not of a jurisdictional nature. Stated in another way, where the court has jurisdiction, an order confirming a sale cures all prior defects and irregularities in the proceedings, and cannot be attacked collaterally."

The same text, at p. 529, § 238, makes the following statement relative to the inadequacy of price:

"*Something more than mere inadequacy of price* must appear before a confirmed sale can be disturbed; and it has been held that even though the inadequacy is gross and accompanied by unfair practices at the sale, or surprise, the sale will not be set aside after confirmation unless fraud can be imputed to the purchaser which was unknown to the parties interested at the time the sale was ratified. A judicial sale cannot be collaterally attacked for inadequacy of price." (Italics ours.)

In 4 Bancroft's Probate Practice 2220, § 1377, we find the following statement:

"An order of confirmation is accorded like force and effect, and supported by the same legal presumptions, as an order of any court of general jurisdiction. The court and guardian, as well as the purchaser, are bound by the order. . . . Unless the contrary appears upon the face of the record, it will be presumed that a sale confirmed by the court was fairly and legally made, and that the court so found."

See, also, 2 Bancroft's Probate Practice 1172, § 651, in regard to findings made in an order of confirmation aiding

the record, and the same text, at p. 1180, § 655, in regard to the mode of attack.

■ We are of the opinion that an order confirming a sale in a guardianship proceeding is a final and conclusive judgment, having the same force and effect as any other final adjudication of a court of competent jurisdiction.

In addition to § 1585, *supra,* we also have Rem. Rev. Stat., § 1504 [P.P.C. § 213-25], which provides:

"No petition or allegation thereof for the sale of real estate shall be considered jurisdictional, and confirmation by the court of any sale shall be absolutely conclusive as to the regularity of all proceedings leading up to and including such sale, and no instrument of conveyance of real estate made after confirmation of sale by the court shall be open to attack upon any grounds whatsoever except for fraud, and the confirmation by the court of any such sale shall be conclusive proof that all statutory provisions and all orders of the court with reference to such sale have been complied with";

and Rem. Rev. Stat., § 591 [P.P.C. § 51-29], relative to confirmation of sales under execution, subd. 4 of which provides in part:

"An order confirming a sale shall be a conclusive determination of the regularity of the proceedings concerning such sale as to all persons in any other action, suit or proceeding whatever."

While the language used in § 591 is not as strong as that used in §§ 1504 and 1585, the intent and effect of these statutes are, in our opinion, the same.

The trial court, in its memorandum decision of December 5, 1946, stated:

"The courts have given to such confirmations the same effect and the same inviolability as a decree itself. The decree itself is subject to being set aside by an appeal or where fraud or a mutual mistake is shown; but as to one or the other, one of these things must be shown in order to upset that decree."

Later in its decision, the court further stated its position as follows:

"I feel now that the better way to determine the whole question is the way I have now. In that way I do no violence to that rule [that a confirmation of sale once made is binding upon the world and upon any court which later might consider the same question] because I am in effect confirming the confirmation of sale entered by Judge Rankin, but I am merely enforcing the whole contract."

We are at a loss to understand upon what legal or equitable theory the court, in this proceeding, could or did confirm the guardianship sale proceedings had before Judge Rankin, after purporting to reform the written contract by changing the purchase price from $4,000 to $6,850, and by including in the sale certain personal property belonging to Mrs. Miller, individually.

We have been cited to no authority which would sustain the action of the trial court in reforming the written contract of December 18, 1945, and then purporting to confirm the sale and all proceedings leading up to the order of confirmation.

By reforming the contract, the court in this proceeding changed the terms of the contract to include things which were never before the court in the guardianship proceeding and never were considered by the court at the time the order of confirmation was entered in such proceeding, which order directed the guardian to enter into the specific contract of December 18, 1945.

Appellants contend that the guardian is attempting to collaterally attack the order of confirmation, while the guardian contends her cross-petition is a direct attack on the order. We do not think it material in this proceeding whether the guardian's cross-petition be considered as a collateral or direct attack. Under § 1585, *supra,* and the authority cited, an order of confirmation can be attacked only for fraud, by which the prevailing party has prevented the unsuccessful party from having a fair submission of the controversy. *Farley v. Davis,* 10 Wn. (2d) 62, 116 P. (2d) 263.

We also desire to call attention to the case of *In re Ostlund's Estate,* 57 Wash. 359, 106 Pac. 1116. In that case

the bidder at an administrator's sale of real estate refused to go through with the sale because he contended that at the time his bid was submitted, the administrator promised to furnish him with an abstract showing fee simple title to the property in one Ostlund, and that the abstract, which was not furnished until after the order of confirmation, disclosed, according to the bidder, that the only interest Ostlund had or could have in the property was a one-half interest. We reversed the judgment of the lower court and held that the sale was good, and required the bidder to comply with the order of confirmation and pay the balance due on the purchase price.

See, also, *Meeker v. Waddle,* 83 Wash. 628, 145 Pac. 967.

In the instant case, the order of confirmation, being a final judgment, could have been appealed from, or the guardian could, by petition, have sought to have the order vacated and modified under the provisions of Rem. Rev. Stat., § 464 [P.P.C. § 71-1].

■ ■ Conceding, for the sake of argument, that the guardian's cross-petition constitutes a direct attack, and that she has sufficiently complied with the procedure, still the only ground for such an attack which could possibly be applicable here would be the fourth ground of § 464, *supra,* namely: "For fraud practiced by the successful party in obtaining the judgment or order." See *Betz v. Tower Sav. Bank,* 185 Wash. 314, 321, 55 P. (2d) 338, and cases cited.

We appreciate that the above cases involve confirmations of execution sales, but we are clearly of the opinion that an order of confirmation is a final judgment in a guardianship sale, the same as in a mortgage foreclosure sale, and that under certain conditions, and where no appeal is taken, such order can be directly attacked within one year only under the provisions of § 464, *supra,* and Rem. Rev. Stat., § 467 [P.P.C. § 71-7] *et seq.*

It is our opinion there was no such fraud alleged in the cross-petition or proved as would justify a vacation or modification of the order of confirmation in the instant proceeding. There was no fraud alleged or proved to have

been perpetrated by the Kings, or either of them, on the court or on the guardian, in so far as the probate sale is concerned. As hereinbefore stated, this sale was conducted entirely by the guardian and her attorney, and in our opinion, the entire proceedings, including the written contract, expressed just what the guardian intended to accomplish by such proceedings.

The only act in the entire guardianship sale which could even be considered as irregular appears from the testimony of the guardian that she took the inventory to the appraisers and instructed them to appraise the real estate at four thousand dollars, when in fact she knew it was worth more than that sum.

We do not desire to unjustly criticize any party to this proceeding or any witness, but we must frankly admit that, in our opinion, the credibility of Mrs. Schlade is somewhat shaken by her actions in connection with the sale. She was apparently a woman of considerable experience in these matters, and was to receive a commission for handling the deal. She testified that the real estate of the minor was worth six thousand dollars, and yet, as one of the appraisers, she appraised it at four thousand dollars, and then certified that four thousand dollars was the fair market value of the property.

The court, in the order of confirmation, found that the sale was fairly conducted. We think the following statement found in *Farley v. Davis, supra,* is applicable here:

"In confirming the sale, the court was required to consider the value of the property, and, in the absence of any indication to the contrary, it must be presumed that it did so."

We seriously doubt that the trial court, in view of the allegations of the cross-petition, should have permitted oral testimony attacking the guardianship sale or the written contract to be introduced in this proceeding over the objections of appellants; but we have considered such testimony, and, having considered it and the record in the guardianship sale, we have concluded that the order of confirmation, which included the written contract as a part

thereof, was a final and conclusive judgment of the court.

We are further of the opinion that no fraud was shown in this action which justified the court in vacating, modifying, or in any way changing the order of confirmation, or in modifying or reforming the written contract which the court directed the guardian to execute.

It seems to us that what we have hereinbefore stated answers all of the contentions made by the guardian relative to her right to have the written contract reformed to comply with what she contends was the original oral agreement, for it seems to us that it must be admitted that the written contract was materially changed by the court's attempted reformation.

From Mrs. Miller's own testimony, it conclusively appears that her ward's estate was to benefit by the sale only to the extent of $4,000, and that she was to receive $2,-850, individually, for her personal property and the money she had expended personally for improvements.

Even assuming, for the sake of argument, that the written contract of December 18, 1945, was subject to the general rules relative to the reformation of contracts, still the guardian has not shown any facts which, in our opinion, would entitle her to reform such contract.

According to a statement found in 45 Am. Jur. 584, § 2,

"The action for such relief rests on the theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake or mistake and fraud, some provision was omitted or mistakenly inserted, and the action is so to change the instrument as to conform it to the contract agreed on."

There was no mutual mistake shown in this case, and, in our opinion, there could have been none, as the contract entered into was the contract which the court ordered the guardian to execute. It expressed just what she intended to express relative to the ward's interest in the property, and what the court understood it to express. The guardian's contention is, in effect, that there were extrinsic facts which, had she known, would have prevented her from entering into the contract.

We appreciate that the trial judge endeavored to reach what appeared to him to be an equitable solution of the situation presented, believing, as we think he did, that if the sale stood as confirmed, the Kings would be able to obtain the property of the minor for considerably less than its fair market value. We may state frankly that we have somewhat the same feeling, but we have been unable to find any legal justification for the action of the trial court in attempting to reform the written contract. We are of the opinion that the sanctity of judicial sales must be maintained, if any stability is to be given to the statutes relative thereto; that where a guardianship sale is conducted in all respects in accordance with the statutes, one attacking such sale should be required to strictly comply with the requirements necessary to obtain relief from an order confirming the sale. We are of the opinion the guardian has failed to show any legal reason for vacating or changing the order of confirmation, or reforming the contract hereinbefore referred to.

The guardian has cited authority relative to actions for specific performance and relative to actions to reform contracts. We are in accord with the general rules therein announced, and with the rules laid down in the cases cited, when applied to the facts of the particular case. However, the authority cited is not controlling in the instant proceeding.

We do desire to refer to the case of *In re Peterson's Estate,* 12 Wn. (2d) 686, 123 P. (2d) 733, because of what the guardian states in her brief relative to the cited case. We quote from respondent's brief, at p. 44:

"The case of *In re Peterson's Estate,* 12 Wash. (2d) 686, establishes the principle that in construing the probate statutes which give a stamp of finality to judicial sales the court will, nevertheless, vacate any such alleged sales if basically mistakenly made by the court. Under such circumstances such alleged sales should be vitiated and the statute cannot be employed, as is contended by appellants here, to immunize such proceedings against attack. The court there said:

" 'This section of the statute (Rem. Rev. Stat. 1504) cannot operate to immunize the particular transfers here in

question against attack at this time and in this manner. . . . It is clear that no such transfers to McKnight would have been confirmed by the court had it not supposed the order allowing that fee to be valid. The orders of confirmation were therefore induced, in large degree, by a mistake of fact so basic as to vitiate them entirely.' "

An examination of the above case will show that there is omitted from the quotation, immediately following the word "manner" and preceding the words "It is clear," the following:

"By these transfers, three in number, certain jewelry together with the two half-lots in Denny's Addition and the Park, Bristol, and Bellevue Apartments, passed into McKnight's possession. All of these transactions were obviously based upon *the order allowing fees, which has been found void for lack of jurisdiction,* and the orders confirming the sales of the real estate expressly referred to that fee and required McKnight to execute and deliver receipts acknowledging part payment thereof to the extent of the agreed prices for the properties." (Italics ours.)

Then follows the last part of the quotation contained in the guardian's brief.

In the instant proceeding, there is, in our opinion, no question but that the court, in the guardianship proceeding, had jurisdiction to make and enter the order of confirmation. It is apparent, therefore, that the above quotation from the *Peterson* case is not applicable here.

For the reasons herein assigned, the decree of the trial court must be, and it is, hereby reversed, and the cause remanded, with direction to enter a decree requiring the guardian to accept the tender of the balance of the purchase price due under the contract, and directing the guardian to make, execute, and deliver to appellants a guardian's deed to the property here involved, together with a certificate of title, as provided for in the written contract of December 18, 1945.

It will be understood that by this opinion appellants are given no right, title, or interest in or to any personal property located in or on the premises, belonging to Mrs. Miller, individually, and she is hereby given thirty days after the

remittitur goes down in which to remove such property.

In order to avoid any further misunderstanding, it is ordered that, if that part of the premises not occupied by appellants is now rented, appellants are entitled to no rent until the remittitur is filed with the clerk of the superior court for Yakima county.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.

October 27, 1947. Petition for rehearing denied.

